NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARK COMPETELLO,<br><br>                 Plaintiff,<br><br>        v.<br><br>CARMEN V. LABRUNO, individually and in his<br>capacity as Chief of Police of City of Hoboken & the<br>CITY OF HOBOKEN, a body corporate and politic,<br><br>                 Defendants. | CIVIL ACTION NO. 02-664 (DRD)<br><br>**O P I N I O N** |

Appearances

Robert C. Griffin, Esq.
GRIFFIN, GRIFFIN & ALEXANDER, P.C.
415 Route 10, Suite 7
Randolph, NJ 07869

        *Attorney for Plaintiff*

Edward J. DePascale, Esq.
Sandra D. Lovell, Esq.
McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962

        *Attorneys for Defendant Carmen V. LaBruno*

Robert E. Levy, Esq.
Michael A. Cifelli, Esq.
SCARINCI & HOLLENBECK, LLC
1100 Valley Brook Avenue
P.O. Box 790
Lyndhurst, NJ 07071

*Attorneys for Defendant City of Hoboken*

**DEBEVOISE, Senior District Judge**

Presently before the Court are the motions of Defendants Carmen V. LaBruno ("LaBruno") and the City of Hoboken ("Hoboken" and together with LaBruno, "Defendants") for summary judgment dismissing the Second Amended Complaint filed by Plaintiff Mark Competello ("Competello").  Essentially, Competello, a police officer, claims that Defendants retaliated against him from 1996 through this litigation because he engaged in protected speech. For the reasons set forth below, LaBruno's motion will be granted and Hoboken's motion will be granted.

## *I. FACTS*

Competello is a police officer employed by Hoboken.  (Compl. ¶ 6.)[1]  LaBruno is the Chief of Police of Hoboken.  (Compl. ¶ 10.)  In 1994, the New Jersey Department of Personnel ("DOP") held a Civil Service promotional examination for the rank of Sergeant for Hoboken and other police departments in New Jersey.  (Compl. ¶ 11(a).)  Competello took this examination, which consisted of both written and oral components.  (Compl. ¶ 11(a).)  There were allegations of cheating on the oral examination, and LaBruno conducted an internal affairs investigation. (Compl. ¶ 11(b).)  He asked the Attorney General to pursue criminal charges against those suspected of cheating.  (Compl. ¶ 11(b).)  Competello alleges that LaBruno "lobbied" the DOP to have the entire promotional list discarded and to issue a new examination.  (Compl. ¶ 11(c).) Hoboken claims that LaBruno communicated with the DOP to request that only the officers

---

[1]Competello has filed a Second Amended Complaint in this case.  All citations to "Compl." refer to the Second Amended Complaint.

accused of cheating retake the oral component.  Competello also claims that LaBruno's actions delayed the certification of the promotional list and thus the promotion of officers to Sergeant. (Compl. ¶ 11(d).)

After several months, on May 7, 1996, Competello wrote to then-Governor Christine Todd Whitman ("the First Communication").  (Compl. ¶ 11(e); Hoboken Cert. Ex. E.)  The First Communication sought Whitman's "assistance in any way with a problem we are experiencing with the NJ Department of Personnel, in regards to our 1994 Police Sergeant's Examination." (Hoboken Cert. Ex. E.)  It went on to state that "our problem begins" when the cheating matter was turned over to the DOP after the Attorney General's investigation.  (*Id.*)  The First Communication complained that there had not been a promotion to Sergeant in Hoboken since 1988, and that the police officers were "getting the run around" from the Department of Personnel. (*Id.*)  Finally, Competello requested Whitman's "intervention . . . to bring this to an expedient resolution, so we may continue with our lives and careers."  (*Id.*)  The First Communication was signed, "Hoboken Police Sergeant Candidates."  (*Id.*)  Competello alleges that on June 10, 1996, when LaBruno found out that Competello had written the First Communication, he told Competello that he "screwed up," that he could not trust him any more, and that Competello would be "lucky" if LaBruno did not "put him on midnights."  (Pl.'s Answer to Hoboken Interrogs. ¶ 1.)  On the same day, LaBruno transferred Competello from the Department of Planning to a far less desirable post in the Bureau of Identification as evidence custodian.  (Competello Aff. at 54-55.)  When Competello was promoted to sergeant, he was "immediately transferred to the midnight shift."  (Compl. ¶ 11(o).)

In September 1997 Competello spoke to George Crimmins, who was the Director of

Public Safety at the time (the "Second Communication").  The Second Communication occurred after the list of sergeants was released and while Plaintiff was waiting to receive his promotion. Plaintiff allegedly asked Crimmins why Plaintiff and three other sergeant candidates were not promoted in August and had to wait until October.  Crimmins allegedly explained that the state police academy class, which was supposed to finish in August, was put off until October, and that LaBruno was studying for his doctorate and wanted to wait until October.  Plaintiff alleges that his inquiry pertained to all three sergeant candidates scheduled to be promoted with him, not merely when Plaintiff would receive his promotion to sergeant.  Plaintiff alleges that when LaBruno found out about the Second Communication, LaBruno threatened Plaintiff, saying that if Plaintiff "kept it up" he would be "buried" when he was promoted.  LaBruno allegedly said, "I am the Chief, and you listen here.  I am advising you not to see the Director [Crimmins] without permission from me."  (Pl.'s Answer to Hoboken Interrogs. ¶ 2b.)

In March 1998, Competello learned that the Lieutenant's test would be called for on September 21, 1998.  (Compl. ¶ 11(q).)  Competello would not have qualified to sit for the examination because he had not yet met the one-year service prerequisite as sergeant.  (*Id.*) He found it was possible to get a waiver of that requirement in certain circumstances.  (*Id.*)  He asked Director of Public Safety Crimmins, who represented the appointing authority, to apply to the DOP for a waiver.  (*Id.*)  Competello later wrote to Crimmins on March 17, 1998 (the "Third Communication").  Competello stated that he was writing the Third Communication "to provide [Crimmins] with some information that may assist you, with your inquiry with the NJ Department of Personnel (DOP) pertaining to a request for a waiver of the Lieutenant's test cut off date."  (Hoboken Cert. Ex. H.)  The Third Communication cited to N.J.S.A. 4A:4-2.6(g),

4

which is the New Jersey statute pertaining to civil service waiver requests.  (*Id.*)  Competello

provided Crimmins with reasons why he and two other sergeants should be granted a waiver.

(*Id.*)  One of the reasons Competello provided was that the City would gain "a better and larger

pool of candidates, ensuring the best possible qualifications for the position of Police

Lieutenant."  (*Id.*)  Eventually, Crimmins applied for and was granted the waiver.  (Compl. ¶

11(r).)  As a result, Competello alleges, LaBruno transferred him to a new shift "not used by the

Department for years," from 8:00 pm to 4:00 am, and Competello was the only one assigned to

this shift.  (*Id.*)  Competello alleges numerous acts on behalf of LaBruno to thwart his promotion

to Lieutenant, in which Competello claims he was treated differently from other police officers,

including that LaBruno threatened him with grand jury investigation and demotion, and that La

Bruno denied him days off to attend group study sessions to prepare for the Lieutenant's Exam.

Competello was eventually promoted to Lieutenant.  (Compl. ¶ 11(ss).)  Competello is still

employed by the Hoboken Police Department.

Competello's complaint contains nine counts.  Counts I and III, brought pursuant to 28

U.S.C. § 1983, allege that LaBruno violated Competello's constitutional rights, including the

right to free speech, due process, and equal protection.  Count II claims that Hoboken is also

responsible for the deprivation of Competello's civil rights because Hoboken "engaged in a

course of conduct of permitting Defendant LaBruno to perform in any manner he chooses," and

that this "has become a traditional way of carrying out policy, and has acquired the force of law."

Count IV alleges the same violations of the New Jersey State Constitution.  Counts V and VI

allege violations of New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A.

10:5-1 et seq., because of the alleged violations of Competello's constitutional rights and

LaBruno's threat to suspend Competello for failing to produce a copy of Competello's memorandum of agreement with Hoboken regarding a delay in Lieutenant's pay.

Count VII alleges that the actions of Captain Daniel Simone ("Simone") of the Hoboken Police Department created a hostile working environment for Competello. Specifically, Competello alleges that Simone "provid[ed] nitpicking supervision with the intention of inflicting stress," and that Hoboken's "failure to protect its employees from wrongful conduct by their supervisors . . . has acquired the force of law." This allegedly permitted Competello "to be subjected to harassment, a hostile work environment, and continued violations of his Civil Rights." Count VIII alleges that Hoboken and LaBruno sought an extension of the Civil Service List for Captain to prevent Competello from competing for the Captain position, in violation of Competello's equal protection rights.

Count IX concerns the Hoboken Police Department's sick policy. The policy requires employees who are sick, and therefore do not come to work, to remained confined in their homes for 24 hours a day unless they leave for medical reasons. Competello claims this sick leave policy violates his United States and New Jersey Constitutional rights and also that it was applied to him such that it violated his equal protection rights. He also alleges that Dr. Jacob H. Jacoby has evaluated him and has determined that he is temporarily, partially disabled, or is in danger of being totally disabled as a result of the conduct alleged in the Second Amended Complaint, and that it would be counterproductive for him to have to remain at home 24 hours a day. Thus, since Hoboken refused to alter its sick policy for him, Competello claims Hoboken has violated the New Jersey Law Against Discrimination ("LAD"), N.J.S.A 10:5-12 et seq.

Hoboken and LaBruno have filed motions for summary judgment, requesting an order

dismissing Competello's Second Amended Complaint in its entirety.  For the reasons that follow, the motions for summary judgment will be granted.

## II. DISCUSSION

### A.      Summary Judgment Standard

Summary judgment will be granted as to any part of the Plaintiff's claim if the record shows "that there is no genuine issue as to any material fact and that the [Defendant] is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there are no genuine issues of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof at trial, as Plaintiff does here, the moving party may satisfy its burden on a motion for summary judgment by showing that the non-moving party has failed to adduce evidence sufficient to establish an essential element that the non-movant would have to prove at trial.  *Id.*  After the moving party meets its initial burden,  the non-moving party "must set forth specific facts showing that there is a genuine issue for trial," or else the court will grant summary judgment.  Fed. R. Civ. P. 56(e)

### B.      The Motions for Summary Judgment

The Court will address the Defendants' motions for summary judgment organized by subject matter rather than by counts of the complaint because Competello's complaint contains many overlapping and similar claims in various counts.

#### 1.   *Alleged Violations of Freedom of Speech*

Competello's major claim is related to retaliation for his allegedly protected speech.  He claims that the Defendants' acts against him violated his right to free speech as guaranteed both by the United States and New Jersey Constitutions.  However, "the expressive rights of public employees are not as expansive as those of citizens outside the public work force."  *Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (3d Cir. 1997).  In order to prove that a public employer

7

violated his free speech rights through retaliation, a plaintiff must prove that: (1) the speech in question was a matter of public concern; (2) the plaintiff's interest in the speech outweighs the state's interest in "promoting the efficiency of the public services it provides through its employees," and (3) that the protected speech was a "substantial or motivating factor in the alleged retaliatory action." *Brennan v. Norton*, 350 F.3d 399, 412-414 (3d Cir. 2003).

Whether speech is protected as a matter of public concern is a question of law. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Id.* If speech involves only personal grievances, though, it is not a matter of public concern. *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3d Cir. 1994). A court should evaluate the speech's content, form, and context to determine if it addresses a matter of public concern. *Brennan*, 350 F.3d at 412-413. When a public employee's speech might be viewed as concerning the public but is actually a "mere extension" of a private personnel dispute, that speech is not a matter of "public concern" and is not protected. *See Connick v. Myers*, 461 U.S. 138, 147-149. Connick was an assistant district attorney, and disputed her transfer to another section of the criminal court. *Id.* at 148. Connick circulated a questionnaire to her co-workers, which contained questions about the confidence and trust they had for various supervisors, office morale, and the need for a grievance committee. *Id.* These questions were not found to be a matter of public concern because they were ultimately focused on "gather[ing] ammunition for another round of controversy with her supervisors." *Id.* A question asking whether the other assistant district attorneys felt pressured to work in political campaigns, however, was a matter of public concern. *Id.*

In Competello's case, none of the three communications address matters of public concern that are more than just "mere extensions" of Competello's private promotion disputes with LaBruno and the DOP. Competello contends that the First Communication, to then-

8

Governor Whitman, implicates public concerns of safety in Hoboken, departmental inefficiency, and disingenuous conduct.  (Pl.'s Opp'n. to Hoboken at 6-7.)  The First Communication purportedly addresses matters of public concern because it is written on behalf of 31 sergeant candidates, complains that there had not been a promotion to sergeant since 1988 in Hoboken and that the date for decisions on promotions had been repeatedly delayed.  (*Id.*)  Despite Competello's characterizations of the First Communication, however, the matters described in the First Communication are not matters of public concern. The relief Competello requests from Whitman is "intervention . . . in this matter to bring this to ***an expedient resolution***."  (Hoboken Cert. Ex. E (emphasis added).)  The subject of the letter is not the inefficiency of the DOP in general but rather a personal grievance that promotions had been delayed.  A response from Governor Whitman would have served the personal gain of Competello, and perhaps the small finite class of sergeant candidates in Hoboken that year, but not the public at large.  Further, Competello's reference to the 31 sergeant candidates really only served to bolster Competello's individual position on the issue, as did most of the questionnaire in *Connick*.  Thus, the First Communication did not implicate a matter of public concern, and therefore is not protected speech.

Competello does not even provide reasons how the Second Communication involved matters of public concern.  (*See* Pl.'s Opp'n Hoboken at 6-7) (providing reasons why the First and Third Communications were in the public interest but skipping the Second Communication). Competello's own description of the Second Communication acknowledges that it merely related to when he would be promoted, and his objections to the delay in promotion.  *(See* Pl.'s Opp'n Hoboken at 11.)  The public could receive no benefit from this communication.  Again, this is a mere "personal grievance" for which public employees do not receive protection.

Competello also does not prevail based on the Third Communication.  Here he wrote to Crimmins to "assist [him] in [his] correspondence with the NJ Department of Personnel, in

9

requesting this waiver for myself, Sgts. McCourt, Williams and Bartley." Competello contends that the Third Communication is protected speech because it would also have an effect on a few other sergeants, and because he wrote that the City would get "a better and larger pool of candidates, ensuring the best possible qualifications for the position of Police Lieutenant," if the waiver was granted. However, a waiver for these few sergeants to apply for the Lieutenant's exam does not have "political, social or other concern to the community,"as required to be protected speech. *See Baldassare,* 250 F.3d at 195. It is not reasonable to draw the inference that having three extra candidates for the position of Lieutenant would truly affect the general welfare of Hoboken. Thus, Competello's statement about the benefits to the city of a waiver and the fact that a few other sergeants might benefit from the letter are purely incidental to the furtherance of Competello's personal grievance with the DOP. Thus, the Third Communication also is not protected speech. Therefore, since none of the claimed communications are protected speech, this Court need not address the other two factors involved in determining whether a public employer has violated an employee's First Amendment rights. Competello cannot prove his claims of free speech violations against the Defendants. Therefore, summary judgment will be granted on all counts that allege free speech violations.

### 2. Alleged Equal Protection and Due Process Violations

Competello alleges that he was singled out in various acts by LaBruno, (*see* Compl. ¶ 11 ) and Captain Simone (*see* Compl. at 40-44), thereby violating his equal protection rights. Hoboken has claimed that the plaintiff must be part of some identifiable class other than himself as an individual for the purposes of an equal protection claim. While Competello has not disagreed with this proposition in either his opposition brief or his oral argument, the Supreme Court has, holding that an equal protection claim can be successful even with a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). However, Competello has not claimed to be part of a protected class of individuals. In equal protection cases, if the plaintiff is

not part of a protected class, the court analyzes the plaintiff's claims under a rational basis standard of review. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-440 (1985). On a rational basis review, the challenged conduct is "presumed to be valid and will be sustained if the classification drawn by [it] is rationally related to a legitimate state interest." *Id.* Moreover, the court need not look to the actual reasons of the state decision maker, but rather any proffered rational explanation for its acts will suffice. *See Williamson v. Lee Optical*, 348 U.S. 483, 487-488 (1955). The Equal Protection Clause does not require a state to treat all people alike. *Price v. Cohen*, 715 F.2d 87, 91 (3d Cir. 1983).

Here Competello's claim fails as a matter of law because he has not offered evidence sufficient to show that his treatment was arbitrary or irrational. In fact, the reason of "departmental efficiency" can be offered for each of the acts against him. The Court need not recite every act, but some examples are the shifts to which Competello was assigned, his responsibilities, the investigation of cheating on the Lieutenant's exam, and limitations on Competello's vacation days. Moreover, the fact that Competello was promoted twice during the complained-of incidents and that he was granted a waiver to take one of the promotional tests belies his claim that he has been denied equal protection by either Hoboken or LaBruno. Thus, summary judgment must be granted on Competello's equal protection claims.

Moreover, Competello's claim is brought pursuant to 42 U.S.C. § 1983. In order for Competello to prevail against Hoboken, a municipality, he must prove that he was deprived of a constitutional right and that such violation was the result of a policy, statement, ordinance, regulation or decision officially adopted and promulgated by the municipality, or pursuant to a governmental custom. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978). Hoboken cannot be held responsible simply for employing LaBruno or Simone if they acted unconstitutionally. *Id.* at 691. In order for there to be a governmental custom for the purposes of Section 1983, it must be "permanent and well-settled." *Adickes v. S. H. Kress & Co.*, 398 U.S.

144, 168 (1970).  The evidence Competello has presented, even if true, is simply not enough as a matter of law to rise to this standard or to show that  Hoboken was "deliberately indifferent" to the acts against Competello.

As for Competello's Due Process claims, Competello does not offer any evidence from which this Court can infer that he was either denied something he had a property interest in, or was denied a grievance procedure such that his substantive or procedural due process rights were infringed by Hoboken, LaBruno, or Simone.  Even assuming for the sake of argument that Competello has a property interest in his job (*see* Pl.'s Opp'n Hoboken at 31-32) Competello has not been terminated, so therefore the Defendants could not have violated Competello's substantive due process right to his job.  Similarly, the Defendants have not denied Competello a right to "employment opportunity," (*see id.*) as he has been promoted twice.  Finally, Competello had a union grievance procedure, so Hoboken did not deny him procedural due process.

### 3.  *Alleged CEPA Violations*

CEPA protects New Jersey employees from "retaliatory action" in three instances. N.J.S.A. 34:19-3.  First, CEPA protects an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law."  N.J.S.A. 34:19-3(a).  Second, employees who "[provide] information to, or testif[y] before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer," are also shielded from retaliation by CEPA.  N.J.S.A. 34:19-3(b).  Finally, an employee is protected when he "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes" is in violation of a law or regulation or is "incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."  N.J.S.A. 34:19-3(c).

Competello has not seriously contended that either N.J.S.A. 34:19-3(a) or (b) apply, as there is no evidence in the record to indicate that he "disclosed" wrongdoing or "provided information to or testified before" any public body that was conducting an investigation into the activities of the Defendants.  However, Competello argues that N.J.S.A. 34:19(c) applies to this case.  (Pl.'s Opp'n LaBruno at 10.)  In order to survive summary judgment on a CEPA N.J.S.A. 34:19(c) claim, the plaintiff must proffer some evidence tending to prove that: (1) he "reasonably believes that his . . . employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law or a clear mandate of public policy," (2) he performed a "whistle-blowing" activity, (3) an adverse employment action was taken against him, and (4) "a causal connection exists between the whistle-blowing activity and the adverse employment action."  *Dzwonar v. McDevitt*, 177 N.J. 451, 462 (N.J. 2003).  In order for a plaintiff to have a reasonable belief that the employer's actions violated a "clear mandate of public policy," the activity must have "public ramifications," and the "dispute between employer and employee must be more than a private disagreement."  *Maw v. Advanced Clinical Communications, Inc.*, 179 N.J. 439, 445 (N.J. 2004).

### a. First alleged CEPA violation

First, Competello contends that the First Communication was an objection to LaBruno's "lobbying" to have the sergeant's test results discarded, and that the Defendants subsequently retaliated against him.  (Pl.'s Opp'n. LaBruno at 10.)  Competello claims that when he wrote the First Communication he reasonably believed that LaBruno's actions were a violation of law or a clear mandate of public policy though he did not know the specific statute or policy.  (*Id.* at 11.)  Now he references N.J.A.C. 4A:10-1.1(c), N.J.A.C. 4A:10-2.4, and N.J.S.A. 11A:1-2(e), essentially stating that the public policy violated was his right to "participate in the selection and appointment process" without obstruction and free from political coercion.  (*Id.* at 13.)  In order to survive summary judgment, Competello must show that this public policy is "closely relate[d]

to the complained-of conduct." *Dzwonar*, 177 N.J. at 463.  Here, the regulations pointed to are not sufficiently related to the conduct Competello purports to complain of in the First Communication, LaBruno's lobbying.  LaBruno never denied Competello an opportunity to participate in the process to become a sergeant; Competello took the test and was eventually promoted.  Though the test results were delayed, they were delayed because of accusations of cheating, and all candidates' results were delayed. There is not, therefore, a sufficiently close connection between delay of publishing results and a public policy against interfering with participation in the selection process for Competello to survive summary judgment..

Further, Competello has provided no evidence from which it can be reasonably inferred that he believed that LaBruno's lobbying violated a clear public policy, nor that this contention was present in the First Communication such that the First Communication constituted a "whistle-blowing activity."  The First Communication makes no reference to LaBruno at all, nor lobbying.  It does not state that Competello believes any policy or regulation has been violated. What the First Communication does critique is the time the DOP has taken to resolve the promotion list.  Plaintiff cannot articulate a reasonable belief that there was a clear public policy that results of promotion lists, in the face of an investigation of cheating, must be published quickly.  This is especially true given *Maw*'s "limiting principle" that the complained- of conduct must have "public ramifications," in order to violate a clear public policy, 179 N.J. at 445, and this Court's earlier determination that the First Communication did not discuss matters of "public concern," *supra* at 8.  Therefore, the First Communication is not protected by CEPA.

**b.  Second alleged CEPA violation**

Second, Competello claims that when he complained about LaBruno denying him vacation days, he was retaliated against in violation of CEPA.  (Pl.'s Opp'n LaBruno at 15.) Competello claims that LaBruno had refused him three vacation days, violating the department's days off policy.  (Pl.'s Opp'n LaBruno Ex. 4.)  Competello has not provided sufficient evidence

that the Defendant's denial of vacation days was a violation of statute, regulation, or clear public policy. The main complaint appears to be that LaBruno violated the Police Department's own self-made regulations regarding sick leave. (*See* Pl.'s Opp'n. LaBruno at 15.) There is no evidence that these regulations had the "force of law" such that reports of their violation would be protected under CEPA. *Cf. Dzwonar*, 177 N.J. at 469 (holding plaintiff's reasonable belief Union violated Union's own bylaws not a proper basis for a CEPA claim). Competello also cannot prevail by arguing that he reasonably believed a breach of regulations for sick days violated a "clear public policy," since *Maw* requires that the complained-of conduct have "public ramifications" in order to be protected under CEPA, and this issue only affects him. 179 N.J. at 445.

In addition, Competello does not survive summary judgment because the Court finds that the purported retaliation as a result of this act of alleged whistle-blowing is insufficient as a matter of law to be protected against by CEPA. Competello claims that as a result of his complaints about the sick leave policy, LaBruno refused to let him take vacation on four instances, LaBruno "eliminated same day vacation requests for the entire department," limited when he could take vacation days, and told him not to switch shifts. Despite the Defendants' contentions (*See* LaBruno Reply at 9), the Defendants need not have subjected Competello to an adverse action "tantamount to discharge, demotion or suspension," in order to be subject to liability under CEPA. *Nardello v. Township of Voorhees*, 377 N.J. Super. 428, 433-434 (App. Div. 2005). However, in this case, though LaBruno's actions might have made Competello unhappy, they do not constitute an "adverse action" as a matter of law. *See Nardello*, 377 N.J. Super. at 434 ("not every employment action that makes an employee unhappy constitutes 'an actionable adverse action.'"); *Hancock v. Borough of Oaklyn*, 347 N.J.Super. 350, 360 (App. Div. 2002) (alleged conduct that made plaintiff's job "unpleasant"and did not effect plaintiff's "compensation or rank," was insufficient to constitute proscribed "retaliation" pursuant to CEPA. Adverse actions, if not affecting the employee's compensation or job rank, must be

15

"serious intrusions" relating to the "essence" of the "employment relationship," in order to qualify as prohibited retaliation pursuant to CEPA. *Beasley v. Passaic County*, 377 N.J. Super. 585, 608 (App. Div. 2005). Competello has been promoted twice while at Hoboken even in the midst of these events, unlike the plaintiff in *Nardello*, who was forced to resign as a leader and member of the SWAT team, was removed from the detective bureau, and was assigned to maintain toilets, in addition to experiencing conduct similar to that which Competello alleges. *Nardello*, 377 N.J. Super. at 433, 435-436. Moreover, denying or limiting vacation days or shift switches cannot fairly be deemed a serious intrusion relating to the essence of the employment relationship. Thus, as a matter of law, the actions of the Defendants with regard to Competello's complaints about the sick leave policy did not violate CEPA.

### c. Third alleged CEPA violation

Finally, Competello alleges that the Defendants violated CEPA because LaBruno retaliated against him when he filed this action. The Court will assume for the sake of argument that this action was filed as a result of a reasonable belief that the Defendants had violated the law or a clear public policy, and that the filing of a CEPA lawsuit could constitute a whistle-blowing activity under CEPA. *Cf. Sandom v. Travelers Mortg. Services, Inc.*, 752 F.Supp. 1240, 1244 (D.N.J. 1990) (holding that retaliation for filing of EEOC claim could serve as basis for CEPA claim; *but cf. Smith v. Travelers Mortg. Services*, 699 F.Supp. 1080, 1083 (D.N.J. 1988) (holding that retaliation for filing of EEOC claim could not serve as basis for CEPA claim). However, the sole retaliation for Competello's filing of his complaint allegedly occurred three months after the complaint was filed, after a "relative period of calm, and even the correction of vacation days and the institution of training where several previous requests had been denied." (Pl.'s Opp'n. LaBruno at 18.) According to Competello, LaBruno called him at home and demanded he produce a copy of a memorandum of agreement he had made consenting to a one-year delay in receiving Lieutenant's pay, on pain of suspension. Again, although the alleged

16

retaliation may have caused Competello some emotional distress, it did not affect his "compensation or rank," nor was it otherwise serious enough to be prohibited by CEPA as an "adverse action."  Furthermore, Competello is unable to offer any evidence from which this Court could draw a reasonable inference that LaBruno's demand of the memorandum has any causal connection with Competello filing a complaint three months earlier, especially with admitted improvements in Competello's employment conditions in the interim.

### d.  Conclusion on alleged CEPA violations

As a matter of law Competello has not provided sufficient evidence from which this Court could infer that the Defendants violated CEPA.  Therefore summary judgment is granted on all counts of the complaint alleging CEPA violations against the Defendants.

### 4. Sick Leave Policy

Competello contends that the Hoboken Police Department's sick leave policy (1) is facially unconstitutional pursuant to the United States and New Jersey Constitutions, because it violates his "liberty interests, freedom of religion, freedom to vote, freedom of access to the Courts, and other freedoms," and (2) is unconstitutional as applied as violative of equal protection because other police officers have been exempted from this policy.  Competello also contends that the Defendants' enforcement of the sick leave policy against him violated the LAD because the Defendants failed to accommodate his "disability."

General Order Number 04-01, issued in February 2001, describes the Hoboken Police Department's sick leave policy.  It provides that whenever an officer is out on sick leave, "he SHALL remain in his residence or place of illness . . . AT ALL TIMES."  (Pl.'s Ex. 32 (emphasis in original).)  It also mandates that the officer may leave the "residence or place of illness for MEDICAL reasons only."  (*Id.* (emphasis in original).)  The officer must contact the Police Department both when leaving the residence for a medical purpose and upon returning.  (*Id.*)  There is also a monitoring policy, used to "monitor the improper use of sick leave."  (*Id.*)

Employees absent "fifteen or more days in any two consecutive calendar years, or more than twenty days in one calendar year shall be placed on a monitoring program." (*Id.*) The monitoring program requires the officer to provide a doctor's note for any future sick leave, as well as offering "support to the individual in controlling or overcoming any existing problem." (*Id.*) The department can also call or visit the officer's house to ensure that the officer is abiding by the restrictions. (*Id.*) The Sick Leave policy does not place any limits, however, on the actual amount of sick days an employee is entitled to take off.

### a. Facial challenge

Courts have been split as to the appropriate standard to apply in cases where a public employer's sick leave policy is alleged to violate an employee's constitutional rights. The Supreme Court has applied a rational basis test when evaluating the validity of a police department regulation on hair length assumed to violate the plaintiff's constitutional rights. *Kelley v. Johnson*, 425 U.S. 238, 247 (1976). In applying the rational basis standard, the Court found "highly significant" the fact that the plaintiff was seeking protection of constitutional rights not "as a member of the citizenry at large, but on the contrary as an employee of the police department of Suffolk county, a subdivision of the State of New York." (*Id.* at 245.) However, the claim in Kelley "implicate[d] only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment," whereas Competello claims violations of rights such as the freedom of religion. The Court of Appeals for the Seventh Circuit has applied a strict scrutiny test when the sick leave policy significantly infringes upon a right guaranteed by the Bill of Rights such as "rights to vote, to exercise freely their religion by church attendance, to go to court, to attend political or family gatherings and to travel." *Pienta v. Village of Schaumburg*, 710 F.2d 1258, 1260 (7th Cir. 1983). Thus the government would be required to demonstrate a compelling interest to justify the sick leave policy. (*Id.*) The Court of Appeals for the Federal Circuit has instead adopted a rational basis test under these circumstances. *Hambsch*

*v. Department of Treasury*, 796 F.2d 430, 434 (Fed Cir. 1986). District Courts in Pennsylvania and New York have similarly applied a rational basis test. *See Loughran v. Codd*, 432 F. Supp. 259, 263 (E.D.N.Y. 1976), *Serge v. City of Scranton*, 610 F. Supp. 1086, 1088 (M.D. Pa. 1985).

The Court of Appeals for the Third Circuit has never fully discussed this issue. However, it did affirm, without opinion, a decision by the Eastern District of Pennsylvania, *Philadelphia Lodge No. 5 v. City of Philadelphia*, 599 F. Supp. 254 (E.D. Pa. 1984), on sick leave policies alleged to violate rights specifically protected by the Bill of Rights. *Local 22, Intern. Ass'n. Firefighters, AFL-CIO v. City of Philadelphia*, 779 F.2d 43, 43 (3d. Cir. 1985) (table op. No. 85-1039) (sub nom). In *Philadelphia Lodge No. 5*, the court held that the rational basis test applied because the regulations at issue were promulgated pursuant to the State's role as employer. 599 F. Supp. at 258. There were two different regulations at issue in *Philadelphia Lodge No. 5*. The court held that the first regulation, which required a police officer on sick leave to merely call when voting or attending religious services, but otherwise required the officer to remain at home, was not unconstitutional. *Id*. However the court noted that the regulation "reserves no authority to the Police Department officials to deny an officer his constitutional right to vote or attend religious services." *Id*. There was also a procedure under which the officer could obtain a pass to permit him to leave the residence for other activities. *Id*. The second regulation pertained to firefighters. Pursuant to it, firefighters could leave their residences while on sick leave only with permission from a supervisor. *Id*. at 259. The court held this regulation unconstitutional because it provided no "reasonable and rational guidelines" regulating the discretion of the supervisors. *Id*. Finally, the court held that the Fire Department's visits of a firefighter's home while he was on sick leave was constitutional. *Id*. The fact that the Third Circuit affirmed this decision is at least persuasive to this Court.

There are various competing policies to consider when deciding upon a standard of review for this sort of case. On one hand, there is the need to protect all individuals, including

public employees, from undue infringement on fundamental rights enumerated in the Bill of Rights. On the other hand is the importance of giving state governments leeway when they are acting as an employer, so that they can conduct their businesses efficiently. As such, as was discussed in this opinion in the section dealing with Competello's First Amendment free speech claims, the courts have limited the rights of public employees. *Supra*, II(B)(2). This second consideration becomes more compelling when the public employer at issue is a Police Department, which is responsible for securing the public safety of the community it protects. Thus, strict scrutiny seems too exacting a standard to apply in order to ensure that the Police Department can issue regulations that enhance its ability to protect the community. For instance, Justice Stevens has recently stated in a case involving whether limitations on political contributions unduly infringed on the plaintiff's constitutional rights:

> This is a case where constitutionally protected interests lie on both sides of the legal equation. For that reason there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words "strict scrutiny." Nor can we expect that mechanical application of the tests associated with "strict scrutiny"--the tests of "compelling interests" and "least restrictive means"--will properly resolve the difficult constitutional problem that campaign finance statutes pose. *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 400 (2000) (Stevens, J., concurring).

However, a mere rational basis test does not appear to protect a public employee's rights enough, especially when the rights claimed to be violated are enumerated in the Bill of Rights. Again, an analogy to the Third Circuit's treatment of First Amendment expression rights is appropriate. The Third Circuit employs a balancing test, not a mere rational basis test, when determining if a public employer has infringed on an employee's right to free speech. *See supra*, II(B)(2). Thus, it would seem that the appropriate test to apply to this case would be "intermediate scrutiny," which is essentially a balancing test and a compromise between strict scrutiny and the rational basis test. 16B Am. Jur. 2d Constitutional Law § 814 (2005) ("'Intermediate scrutiny,' wherein a challenged classification need only further a substantial state

interest, is employed . . . when legislation is not facially or constitutionally invidious, but nonetheless gives rise to some recurring constitutional difficulties.").  In fact, in *Nixon*, Justice Stevens recognized:

> where a law significantly implicates competing constitutionally protected interests in complex ways--the Court has closely scrutinized the statute's impact on those interests, but refrained from employing a simple test that effectively presumes unconstitutionality. Rather, it has balanced interests. And in practice that has meant asking whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others (perhaps, but not necessarily, because of the existence of a clearly superior, less restrictive alternative). 528 U.S. at 402.

Thus, this Court holds that the intermediate scrutiny standard is appropriate when a public employee alleges that a public employer has violated his fundamental rights because of the competing interests at stake.  Hoboken must demonstrate that the sick leave policy furthers a "substantial state interest."  Here, both the monitoring policy and the policy requiring that officers stay at home do further a substantial state interest in ensuring that police officers do not abuse their sick leave privileges.  This allows the police force to be adequately staffed so that the public may be protected.  In fact, this is the stated purpose of the Monitoring Policy.  (Pl.'s Ex. 32 at 5.)[2]  Though the policy does infringe incidentally on Competello's rights, it is sufficiently necessary and narrowly tailored to meet the intermediate scrutiny standard.  Since Hoboken's policies satisfy the intermediate scrutiny standard, they also necessarily satisfy the rational basis standard, should the Court of Appeals eventually utilize the rational basis standard.  Therefore, summary judgment is granted on this claim because Hoboken's sick leave policy is facially constitutional.

---

[2] The monitoring policy itself states, "The police department and its employees both have a vested interest in combating abuses of sick leave.  Unnecessary or unauthorized absences detract from the efficient delivery of services to the public, which we serve and unfairly impact upon the safety and job satisfaction of other employees who are required to shoulder the burden of an increased workload."

21

**b. Equal protection challenge**

Competello alleges in his complaint that the sick leave policy, as applied, is a denial of equal protection under the law.  (Compl. at 48.)  This is allegedly because "[o]thers who have been out on sick leave have been exempted from this policy." (*Id.*)  Competello claims that he "has been singled out for the harsh treatment this policy imposes." (*Id.*)  However, in response to Defendants' summary judgment motion, Competello has not produced any evidence of anyone who has been exempted from this policy nor that he has been singled out in the application of the sick leave policy.  Therefore, drawing all reasonable inferences from the evidence given, Competello cannot prevail as a matter of law on this claim.  Further, even if he had evidence that others were treated differently, Competello has not identified himself as a member of any certain protected class.  Thus, he would have to produce evidence from which this Court could infer that Hoboken applied the sick leave to him completely arbitrarily and irrationally to survive summary judgment.  This he also cannot do.  Summary judgment is granted on this claim as well.

**c.  LAD claim**

Finally, Competello claims that Hoboken's failure to exempt him from the sick leave policy and monitoring policy violate the LAD.  (*Id.*)  Competello claims a psychological "disability" that arose out of the Defendant's conduct at the Police Department.   Dr. Jacob H. Jacoby examined Competello and diagnosed him with a "moderate to severe adjustment disorder with mixed anxiety and depressed mood, secondary to the perceived harrassment." (Pl.'s Ex. 30.)  Dr. Jacoby also stated that Competello "is on the verge of being completely psychiatrically disabled from being fit for duty as a police officer." (*Id.*)  Competello "is best seen as being temporarily and partially disabled to the point that it would be both in his interest and the interest of his department for him not to be working on active, full-time duty." (*Id.*)  Dr. Jacoby recommended that Competello immediately enter psychiatric treatment, and be relieved of his duties.  (*Id.*)  Competello would need at least a year of treatment before reducing the frequency

of therapy and medication.  (*Id.*)  Competello claims that since his disability is derived from his work conditions, and because a doctor has documented the disability, he should not have been required to stay home while on sick leave, as Hoboken's policy requires.  He also claims that he needs to be able to leave the house to "engage in activities such as going to the gym, [and] shopping . . . in order to recover."  (Compl. at 48.)

There is no material issue of fact about Competello's condition, so this Court must accept that Competello is "partially or temporarily" mentally disabled for the purposes of this motion. However, Competello's failure to accommodate claim is clearly inapposite.  Under New Jersey law, "although an employer must consider reasonably accommodating an employee with a disability, that duty 'extends only so far as necessary to allow 'a disabled employee to perform the essential functions of his job.'"  *Hennessey v. Winslow Township.*, 368 N.J.Super. 443, 452 (App. Div. 2004). "Cases interpreting the federal statutes, both the Rehabilitation Act and the ADA, agree that chronic and excessive absenteeism need not be accommodated. The same holds true for cases interpreting such anti-discrimination statutes under state law." *Svarnas v. AT & T Communications*, 326 N.J.Super. 59, 77 (App. Div. 1999).  "An employee who demonstrates an inability to attend work with any degree of predictability and reliability cannot be reasonably accommodated."  (*Id.* at 78.)  And an employer need not accommodate an employee with indefinite leave.  (*Id.* at 79.)  Therefore, it follows that as a matter of law, Hoboken did not need to alter its leave policy for Competello, since Competello claimed that he could not go back to work because it was work itself that was causing his "disability."  An employer must make accommodation under the LAD for the disabled employee to be able to work, not make accommodations in the conditions of the employee's leave to make the leave more comfortable than the leave would be for other non-disabled employees.  Summary judgment must be granted for the Defendants on this claim.

Further, the New Jersey regulations state that all employers "shall conduct their

employment procedures in such a manner as to assure that all people with disabilities are given equal consideration with people who do not have disabilities for all aspects of employment including . . .leaves on the basis of their qualifications and abilities."  N.J.A.C. 13:13-2.5(a).

Here Competello was given the same consideration for leave as those without his "disability." Moreover, there is no evidence in the record from which this Court can draw a reasonable inference that LaBruno created the sick leave policy, so summary judgment would be appropriate for as to LaBruno individually for that reason as well.

### III.  CONCLUSION

The Court has concluded that none of Competello's claims can survive the Defendants' summary judgment motions.  Therefore, the summary judgment motions of Hoboken and LaBruno are granted in their entirety.


/s/ Dickinson R. Debevoise

DICKINSON R. DEBEVOISE, U.S.S.D.J.


DATED: July 12, 2005

24